## ST. VINCENT COLLEGE v. HALLETT.

(Circuit Court of Appeals, Seventh Circuit.   April 23, 1912.   Rehearing
Denied July 1, 1912.)

### Nos. 1,806, 1,807, 1,808.

1. COLLEGES AND UNIVERSITIES (§ 7*)—OFFICERS—AUTHORITY OF PRESIDENT—
BY-LAWS.

The by-laws of a college corporation placed its management in the
hands of five trustees and declared that no purchase of real estate, deed,
mortgage, or note to secure a loan should be made unless authorized by
resolution and at a meeting of the members of the college.   They also
provided that the president should preside at meetings, that he should
execute all instruments of every kind in and about the business of the
college, and should in general exercise all authority and perform all acts
usually exercised and performed by presiding officers of colleges.   *Held*,
that such by-laws should be construed as merely designating the president
as the officer who should perform the ministerial acts necessary to carry
out orders of the trustees, and therefore did not authorize the president,
by virtue of his office, to bind the corporation by the execution of notes
to evidence loans not authorized by the trustees.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig.
§§ 16–19; Dec. Dig. § 7.*]

2. CORPORATIONS (§ 432*)—NONTRADING CORPORATION—OFFICERS—POWER OF
PRESIDENT—EXECUTION OF NOTES—PRESUMPTION.

In general there is no presumption that the president of a nontrading
corporation has authority, solely by virtue of his office, to execute notes
purporting to evidence loans to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717, 1718,
1724, 1726–1737, 1743, 1762; Dec. Dig. § 432.*]

3. COLLEGES AND UNIVERSITIES (§ 7*)—OFFICERS—POWER OF PRESIDENT—EX-
ECUTION OF NEGOTIABLE PAPER—ILLINOIS RULE.

The Illinois rule, that as against an innocent holder the act of the
president of a corporation in executing a note in its name binds the cor-
poration, was not applicable so as to bind an Illinois educational cor-
poration, not organized for profit, by notes executed by its president for
loans for his own purposes for which the corporation received no benefit,
or consideration directly or indirectly, and which were neither authorized
nor ratified by the corporation's trustees.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig.
§§ 16–19; Dec. Dig. § 7.*]

4. CORPORATIONS (§ 429*)—COMMERCIAL PAPER—EXECUTION—AUTHORITY OF
OFFICERS.

The rule requiring a purchaser of commercial paper executed by a cor-
poration to ascertain whether its issuance was authorized by the corpora-
tion's managers or board of directors, either by giving the executing offi-
cers original authority or by express or implied ratification is the law in
New York and most states, and therefore cannot be supposed to burden
commerce.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1720–1723,
1725; Dec. Dig. § 429.*]

5. COLLEGES AND UNIVERSITIES (§ 7*)—COMMERCIAL PAPER—EXECUTION—AC-
TIONS—PLEA—NON EST FACTUM.

Where, in an action on notes of a college corporation executed by the
president, defendant filed a verified plea of non est factum, it was error
for the court to exclude evidence offered under such plea to rebut any

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes·

presumption of authority of the president to execute the notes; the issue of such want of authority being properly raised by such plea.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig. §§ 16–19; Dec. Dig. § 7.*]

Humphrey, District Judge, dissenting.

In Error from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois; George A. Carpenter, Judge.

Actions by Edward L. Suffern and another, doing business as Suffern & Son, by National Copper Bank, and by Allen P. Hallett against St. Vincent College. Judgment for plaintiff in each case, and defendant brings error. Reversed and remanded, with directions.

Jesse McDonald, of St. Louis, Mo., and William E. O'Neill and Charles L. Mahony, both of Chicago, Ill., for plaintiff in error.

Clark M. Cavenee, W. W. Gurley, Arthur Dyrenforth, and Sidney W. Worthy, all of Chicago, Ill., for defendant in error Hallett.

Moritz Rosenthal, Henry H. Kennedy, Joseph W. Moses, Julius Moses, Hamilton Moses, and Walter Bachrach, all of Chicago, Ill., for defendant in error National Copper Bank.

Eli B. Felsenthal, John W. Beckwith, Edward G. Felsenthal, and Walter J. Spengler, all of Chicago, Ill., for defendant in error Suffern & Son.

Before KOHLSAAT and MACK, Circuit Judges, and HUMPHREY, District Judge.

MACK, Circuit Judge. A single question is presented for adjudication in each of these cases: Is a promissory note in the hands of a holder in due course, executed in the name of an Illinois corporation organized under the general act relating to corporations not for pecuniary profit, by its president, the obligation of the corporation, if such execution was neither expressly nor impliedly (either generally or in the specific instances) authorized or ratified, either by the members or the board of directors (unless such general authority arises from the provisions of the statute, charter, or by-laws hereinafter set forth), if it was done for the president's own purposes, and if the corporation received no benefit therefrom or consideration therefor, either directly or indirectly?

The trial judge to whom the cases were submitted, by his rulings on the pleadings and the evidence answered this question in the affirmative, and rendered judgments against St. Vincent College on nine such notes ranging in amount from $5,000 to $40,000.

The objects of the corporation as stated in its articles of incorporation are "to obtain sites for and to build college and school buildings for its own use, and such appurtenances thereto as may be necessary for its own use; and to employ professors, teachers and such other employés as may be necessary; to provide and establish courses of study, classical, scientific, commercial, divinity, art and mechanics, and in all lower branches of learning."

Chapter 32, Hurd's Rev. Stat. of Illinois, 1905, being the act under which the corporation was formed, provides, in so far as here material, as follows:

"Sec. 31. Corporations, associations and societies not for pecuniary profit, formed under this act shall be bodies corporate and politic; * * * may have power to make and enforce contracts in relation to the legitimate business of their corporation; * * * and they and their successors, by their corporate name shall, in law be capable of taking, purchasing, holding and disposing of real, and personal estate for purposes of their organization; may by their trustees, directors or managers, make by-laws not inconsistent with the laws of this state, or of the United States, which by-laws, among other things, shall prescribe the duties of all officers of the corporation. * * *

"Sec. 32. Corporations, associations, and societies, not for pecuniary profit, formed under the provisions of this act, may select trustees, directors or managers from the members thereof, in such manner, at such times and places and for such periods, as may be provided by the certificate of incorporation, or in case such certificate does not contain such provisions, then as may be provided in the by-laws, which trustees, directors or managers shall have the control and management of the affairs and funds of the corporation, society or association. Said trustees, managers or directors may, upon consent of the corporation, society or association, expressed by the vote of the majority of the members thereof, borrow money, to be used solely for purposes of their organization, and may pledge their property therefor. Whenever trustees, managers or directors shall be elected, a certificate under the seal of the corporation, giving the names of those elected and the term of their offices, shall be recorded in the office of the recorder of deeds, where the certification of organization is recorded. Vacancies in the board of trustees, directors or managers shall be filled in the manner provided by their by-laws, and upon filling any vacancy a like certificate shall be recorded. * * * *"

[1] The only by-laws that in any manner refer to the powers of the president or the trustees are as follows:

"Five trustees shall be elected by the college every three years, commencing at the expiration of the term of the first board. * * * The trustees shall exercise control over the affairs of the college. Any three of them shall form a quorum for the transaction of business, but no purchase of real estate, no deed of transfer or mortgage of the real property of the college, or note to secure a loan, shall be made unless authorized by resolution of and at a meeting of the members of the college, a quorum being present.

* * * * * * * * * * * *

"The president shall call or order the secretary to call all meetings. He shall preside at such meetings. He shall execute all instruments of every kind in and about the business of the college, and he shall in general exercise all authority and perform all acts usually exercised and performed by presiding officers of colleges."

All the notes in these suits, with one exception, are in the following form, differing only in amount, date, name of payee, and place and time of payment:

"$25.000.00.                    Chicago, Illinois, February 8, 1908.

"Four months after date we promise to pay to the order of Fidelity Funding Company, twenty-five thousand dollars at Central Trust Company, Chicago. Value received.          St. Vincent College, by P. V. Byrne, C. M. Pres.

"No. 2605.

"Due June 8, '08."

The one exception referred to is a note in the same form as the others except that it is signed: "St. Vincent College, by P. V. Byrne, C. M. Pres. Hugh J. O'Connor, Acting Treas."

The undisputed facts appearing from the record are that the notes were signed by P. V. Byrne and Hugh J. O'Connor; that at the time of the signing P. V. Byrne was the qualified and acting president, and Hugh J. O'Connor was the qualified and acting treasurer of the defendant below; that the indorsements on the notes were genuine; that the several plaintiffs below were holders in due course; and that none of the notes had been paid.

Many questions have been argued that are beside the real point in the case. Ultra vires is not involved; the corporation had power to issue negotiable paper. Nor is the fundamental question one that is governed by the law of negotiable instruments. It is essentially a question of agency. Is the president of such a corporation, solely by virtue of his office, authorized to bind the corporation as principal?

It is contended by defendants in error that the by-laws expressly authorize the president to execute corporate notes, and that therefore the real question in the case is whether or not the act of the president, although not authorized in the specific instance and although not for corporate purposes, is nevertheless binding on the corporation because the power of the board of directors has been fully and lawfully delegated to him.

If the by-laws had provided that not only the power to execute instruments, but the power to determine when such execution is necessary or desirable in the management of the affairs of the corporation, shall be vested in the president, either the holder in due course of negotiable paper or the other innocent party to any ordinary contract made by the president apparently on behalf of the corporation, could hold the corporation to the same extent as if the board of directors had specifically authorized or ratified the transaction.

Under such a by-law, the sole question would be whether or not the action of the president or the board of directors would be binding without a vote of a majority of the members. Louisville, New Albany & Chicago Railway Co. v. Louisville Trust Co., 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081, would be a strong authority in favor of the note holder in that event. In that case the defendant railway company was a corporation organized under a statute of the state of Indiana, which contained the provision that:

"The board of directors of any railway company organized under and pursuant to the laws of the state of Indiana, whose line of railway extends across the state in either direction, may, upon the petition of the holders of the majority of the stock of such railway company, direct the execution by such railway company of an endorsement guaranteeing the payment of the principal and interest of the bonds of any railway company organized under or pursuant to the laws of any adjoining state, the construction of whose line or lines of railway would be beneficial to the business or traffic of the railway so endorsing or guaranteeing such bonds."

A negotiable guaranty of certain bonds was executed under the seal of the corporation *by order of the board of directors, and signed by the president and secretary of the corporation, although a majority of the stockholders did not petition* for the execution of the guaranty, as required by the statute. There was no evidence that the stock

holders ever authorized the contract or the guaranty; on the contrary, at their next annual meeting it was voted to reject and disapprove both the contract and the guaranty as having been made without legal authority.   Before the stockholders' meeting was held at which this action of disapproval took place, 135 of the bonds on which the guaranty was made had been negotiated and sold to bone fide purchasers. The corporation was nevertheless held liable because the act of the board of directors binds the corporation as against one who has no knowledge that the board of directors is violating its duty.   As Mr. Justice Gray says (174 U. S. 573, 19 Sup. Ct. 825, 43 L. Ed. 1081):

"One who takes from a railroad or business corporation, in good faith, and without actual notice of any inherent defect, a negotiable obligation issued by order of the board of directors, signed by the president and secretary in the name and under the seal of the corporation, and disclosing on its face no want of authority, has the right to assume its validity, if the corporation could, by any action of its officers or stockholders, or of both, have authorized the execution and issue of the obligation."

The reason for this principle is found in the opinion of Judge Taft when the case was decided by the Circuit Court of Appeals.   He said (75 Fed. 433, 452, 22 C. C. A. 378, 398):

"The requirement that, in the exercise of the power of guaranty, the initiative should be taken by the stockholders by petition, was a regulation of the internal management of the corporation for the benefit and protection of the stockholders."

If, however, the by-laws contain no such grant of power, if soundly interpreted they merely designate the officer who is to perform the ministerial acts necessary to carry into execution the orders of the board of directors in whom by the statute the management of the business is vested, the Louisville Case is no authority in favor of the contention that the president, even of a business corporation, may virtute officii bind the corporation.   On the contrary, all of the intimations in the opinion of the Supreme Court are to the contrary.   And in the opinion of Judge Taft in the Circuit Court of Appeals (75 Fed. 433, 22 C. C. A. 378) the reason for this distinction between the binding effect of an act authorized by the board of directors, even though without the prescribed consent of the members, and the act of a mere officer unauthorized by and without the consent of the board of directors, is pointed out at page 461 of 75 Fed., page 407 of 22 C. C. A., as follows:

"It has been urged by way of reductio ad absurdum that the same reasoning which raises a conclusive presumption of regularity in favor of a stranger advancing money on the faith of action by directors would require that the presumption arising from the affixing of the seal by the secretary and the signature of the corporation by the president, that the board of directors ordered them upon due authority received from the stockholders, should be equally conclusive.   It is not necessary for us to decide the question suggested until it arises.   It will suffice to point out the manifest distinction between such a case and the one under discussion.   The secretary and the president, in affixing the seal and signature, are mere ministerial officers.   They have no discretion to exercise in the matter of guaranty.   They are the mere subagents of the corporation—the fingers of the board of directors, so to speak—in this matter; and it would seem that in a case in which not only the action of the directors is necessary, but that of the stockholders, the unauthorized use of the

seal by the secretary, or of the name of the company by the president, to give the appearance of validity to a pretended guaranty, would be as far short of binding the company as a forgery."

See, too, Cook on Corporations (6th Ed.) § 725, p. 2355: "These rules (referring to 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081), however, do not apply to usurpations of authority by corporate officials."

In our judgment, the by-laws of St. Vincent College do not invest the president with any general authority to issue notes. They merely designate him as the one officer who is to perform the ministerial duty of signing such instruments as may, under proper authority, be required in and about the business of the corporation. The final clause of the by-laws (hereinabove quoted) vesting in him such authority as is usually exercised by presiding officers of colleges, adds nothing to his power in the absence of any evidence as to the usual authority of such officers.

[2] We come, then, to a consideration of the vital question in the case: Has the president such authority solely virtute officii?

The authorities are in irreconcilable conflict in the case of an ordinary trading corporation. Three rules may be found:

First. That there is no presumption in favor of such authority. This conservative view is supported probably by the weight of authority.

Second. That there is a presumption in favor thereof, but the presumption may be rebutted. The weight of the more recent authorities supports this view.

Third. The so-called Illinois doctrine, that as against an innocent party the act of the president binds the corporation. This is not limited to negotiable paper, but extends to any ordinary business transaction.

The authorities on the question will be found collected by the text-writers: 3 Cook, Corporations (6th Ed.) § 716; 2 Thompson on Corporations (2d Ed.) § 1452 et seq.; 3 Clark & Marshall, Private Corporations, § 701.

If we were to decide this question as one of general commercial law, and not of Illinois law, we should follow the great weight of American authority and hold that no irrebuttable presumption of the president's authority arises by virtue alone of his office. One federal case has been cited holding the contrary view. American Exchange Nat. Bank v. Oregon Pottery Co. (C. C.) 55 Fed. 265. No reasons are given in support thereof, and we agree with the Supreme Court of Arkansas (City Electric Street Ry. Co. v. Bank, 62 Ark. 33, 34 S. W. 89, 31 L. R. A. 535, 54 Am. St. Rep. 282) that the two cases cited by the learned judge do not sustain his own conclusions.

In National Bank of Commerce v. Atkinson (C. C.) 55 Fed. 465, the opposite result was reached. The court says:

"The president of a bank has no power inherent in his office to bind the bank by the execution of a note in its name, yet the power to do so may be conferred upon him by the board of directors, either expressly, by resolution to that effect, by subsequent ratification, or by acquiescence in transactions of a similar nature, and of which the directors have knowledge."

While the Oregon Pottery Case has been cited in no other federal case, the Atkinson Case was affirmed in the Circuit Court of Appeals (Nat. Bank of Commerce v. First Nat. Bank of Kansas City, 61 Fed. 809, 10 C. C. A. 87), cited in Wilson v. Pauly, 72 Fed. 135, 18 C. C. A. 475, and followed in Park Hotel Co. v. Fourth Nat. Bank of St. Louis, 86 Fed. 745, 30 C. C. A. 409.

In a recent federal case (In re Jefferson Casket Co. [D. C.] 182 Fed. 689) it was held that the president of a corporation, as such, had no authority to represent the corporation. In that case, a voluntary petition in bankruptcy was filed on behalf of a corporation, signed and verified by its president. It failed, however, to show that any corporate action had been taken by the board of directors authorizing the filing of the petition, or empowering the president to execute the petition in the name of the corporation. It was held that the petition was insufficient to confer jurisdiction on the court to adjudge the corporation a bankrupt. Although this case could have been rested on the ground that filing a petition in bankruptcy is not an act done in the ordinary course of business, the court cites, among other authorities state and federal, People's Bank v. St. Anthony's Roman Catholic Church, 109 N. Y. 512, 17 N. E. 408, infra, and the other New York cases to the same effect.

In Dexter Savings Bank v. Friend (C. C.) 90 Fed. 703, the court expressly based its decision on the ground that the president-treasurer had been given a general authority to execute notes in the ordinary course of the business of the corporation. The court, however, significantly said:

"A distinction must be made between cases where there is an absolute want of authority on the part of the agent, and cases where the agent has authority, but abuses it. Where the agent has authority, and where commercial paper is the subject of the transaction, an innocent holder of the paper gets just what he bargained for; but, where the agent is without authority, the holder gets nothing."

Farmers' National Bank v. Sutton Mfg. Co., 52 Fed. 191, 3 C. C. A. 1, 17 L. R. A. 595, was likewise a case where the agent (secretary-treasurer) had "full and general authority" to sign and issue business paper on behalf of the corporation, and the decision was based thereon.

But even in those cases in which authority is presumed from the nature of the business, an executive officer cannot bind a bank by a transaction out of the ordinary course of business. Western National Bank v. Armstrong, 152 U. S. 346, 14 Sup. Ct. 572, 38 L. Ed. 470. In that case it was held that the vice president (the principal executive officer of the bank), as such, could not, without the authority of the board of directors, bind the bank by borrowing some $200,000 on four months' time, because such a transaction could not be said to be in the ordinary course of business. Similarly, it may well be said that the execution of notes from $5,000 to $40,000 is not a transaction in the ordinary course of the business of a college.

[3] Assuming, however, that we are to apply the law of Illinois, inasmuch as the plaintiff in error is an Illinois corporation and executed the notes in this state, it becomes necessary to consider the de-

cisions which it is claimed establish the so-called Illinois rule and to determine whether or not they are applicable to the instant case. Such an examination will disclose that while in many cases the principle is stated broadly, yet in many others, and among these the more recent ones, the presumption of authority· is not deemed irrebuttable.

For example, in Alton Manufacturing Co. v. Garrett Biblical Institute, 243 Ill. 298, at page 303, 90 N. E. 704, at page 706, the court says:

"The trustees, having power to borrow money for proper corporate purposes and execute notes therefor, might exercise this authority in a number of ways: (1) They might appoint one of their number as agent of the corporation for that purpose and expressly or impliedly clothe him with authority to borrow money and give notes; (2) where no actual authority has been conferred upon the agent of the corporation to borrow money and give notes, but where the agent has done so, and with full knowledge of all the facts the corporation has approved and ratified the acts of the agent, it will be liable to the same extent as if actual authority had been given to perform the acts; (3) where no authority had been given or existed in the agent to borrow money but where the corporation received the use and benefit of the money it will be· liable; (4) by holding an agent out to the public as possessing authority to exercise the powers assumed by the agent and to do the acts performed by him, in which case the corporation would be bound to the extent of the agent's apparent authority."

In Lloyd v. Matthews, 223 Ill. 477, 79 N. E. 172, 7 L. R. A. (N. S.) 376, 114 Am. St. Rep. 346, the court says:

"The president is by virtue of his office, recognized as the business head of the company, and any contract pertaining to the corporate affairs, within the general powers of such officer, executed by the president on behalf of the corporation, will, *in the absence of proof to the contrary*, be presumed to have been by authority of the corporation. If the contract in question had been executed by some agent who ordinarily does not have the power to sign such instruments, and the execution had been put in issue by properly verified plea, then it would be necessary to go beyond the mere fact of the execution of the instrument, and prove the authority of the agent to execute the same. But when the contract is properly executed for ·the corporation by its president, and it is such a contract as the corporation might lawfully make, the proof of the execution by the president is all that is required, *in the absence of any evidence to the contrary* showing that the contract was not made by the authority of the corporation."

Moreover, in every Illinois case in which the so-called Illinois rule is laid down, it will be found that the corporate liability could have been based on the evidence of implied authority arising from the prior course of business, ratification either express or implied, or so-called estoppel; more properly unjust enrichment arising from the retention of benefits derived by the corporation from the transaction.

Assuming, however, that in Illinois a business corporation would be absolutely bound by the wrongfully issued notes executed in its name by its president and held by a bona fide purchaser, has the same principle been extended, or shall it be extended, to a corporation not for pecuniary profit, either because such a corporation, too, may engage in some business transactions, or for any other reason?

. This question has never been expressly decided by the Supreme . Court of Illinois.

In St. Patrick's Roman Catholic Church of East St. Louis v. Abst,

76 Ill. 252, the liability of the church for the salary of a sexton employed by the priest without direct authority from the board of trustees as such, but with the approval of a majority of the individual trustees, was based on ratification by subsequent conduct.

In St. Patrick's Roman Catholic Church v. Gavalon, 82 Ill. 170, 25 Am. Rep. 305, the officiating priest of a church, who was a member and the chairman of its board of three trustees, employed a person to work for the church, without authority of the other trustees. A majority of the court held the church not liable, both on the ground that the priest had no authority to bind the church without being authorized by the board of trustees, and also because there was some evidence that the priest personally engaged him. They say:

"The unauthorized act of one of the trustees could not be held to bind the church as a corporation. This has been held as to directors of schools, and as to trustees of other churches, where they have given notes in their individual names for property applied to the use of the church. Powers v. Briggs, 79 Ill. 493 [22 Am. Rep. 175]; Burlingame v. Brewster, 79 Ill. 515 [22 Am. Rep. 177].

"In this case, it would not matter that some of the labor was performed for the church, if the priest alone employed the appellee, without express or implied authority from the other trustees, or the act was ratified by them."

The three dissenting judges based their dissent on the fact that the church had received the benefits:

"At all events, he assumed to act on its behalf, without objection from any one, and the society or church availed of the benefit of his acts."

Nor has any other court, so far as we have been able to find, held a charitable corporation bound on the contracts or notes of its president or any other officers, in the absence of some showing either of authority, ratification, or estoppel. All the authorities are the other way.

It is no answer to say that in other states, unlike Illinois, even a business corporation is not absolutely bound by such acts of its officers, for a distinction is made between the two classes of corporations, in that in many of the states there is at least a rebuttable presumption that the president of a trading corporation was authorized, while no such presumption arises as to the acts of the president of a charitable or even of a nontrading business corporation.

In People's Bank v. St. Anthony's Roman Catholic Church, 109 N. Y. 512, 17 N. E. 408, where, as in the case at bar, a charitable corporation was sued on notes executed on its behalf by its officers, the notes sued on purported on their face to be the obligations of the corporation, recited that they were given for loans made by the payee to the corporation, and were signed by the president, secretary, and treasurer of the corporation (three of five members of its board of trustees) in their official character. They executed the notes without authority from the board of directors as such. In holding that the corporation was not bound, the court says:

"It is not the common usage or understanding that the president, secretary, and treasurer of a religious corporation possess power, by virtue of their offices, to borrow money for or issue notes of the corporation. They

may be the agents usually designated to issue such obligations when their issuance is determined upon by the trustees; but they are special and not general agents of the corporation, and can only act in such a transaction by virtue of a special authority, and their authority must be shown by those claiming to bind the corporation upon obligations issued by them." Columbia Bank v. Gospel Tabernacle Church, 127 N. Y. 361, 28 N. E. 29; Lyndon Mills Co. v. Lyndon Literary & Biblical Inst., 63 Vt. 581, 22 Atl. 575, 25 Am. St. Rep. 783.

In Packard v. Universalist Society, 10 Metc. (Mass.) 427, the court says:

"To establish the authority of a treasurer of a corporation to bind the corporation by executing promissory notes, accepting drafts, etc., the plaintiff has referred us to the cases of Narragansett Bank v. Atlantic Silk Co., 3 Metc. [Mass.] 282, and Bates v. Keith Iron Co., 7 Metc. [Mass.] 224. But these were cases of trading and manufacturing corporations, and they furnish no analogy for cases of parishes or religious societies. There is nothing in the nature of the business to be done, or the duties which devolve upon the treasurer of such corporations, that can require or justify the giving of negotiable instruments binding the society, without being authorized by a special vote to that effect."

See, too, People's National Bank v. New England Home, 209 Mass. 48, 95 N. E. 77.

The same rule is applied to a nontrading business corporation in Craft v. South Boston Street R. R. Co., 150 Mass. 207, 22 N. E. 920, 5 L. R. A. 641:

"Whatever may be true of trading corporations, there is nothing in the nature of the business of a horse railroad corporation, or of the duties of a treasurer of such a corporation, which implies that the treasurer, by virtue of his office, has authority to borrow money for the company and give its notes therefor. It does not appear that the company in any way held out Reed to the public or to the plaintiff as having any such authority; or that treasurers of horse railroad corporations customarily have or exercise any such authority."

See, too, Jewett v. West Somerville Co-operation Bank, 173 Mass. 54, 52 N. E. 1085, 73 Am. St. Rep. 259.

While the decision of Judge Blodgett in Palmer v. Wardens, etc. (C. C.) 16 Fed. 742, is based primarily on the failure to prove that the persons signing the instruments were in fact the officers of the Illinois religious corporation, the reasoning in the opinion is in accord with that of the Massachusetts cases.

This distinction as to the implied or presumptive authority of an officer as agent of a trading corporation on the one hand, and of a nontrading business or of a charitable corporation on the other, is based on the character of the business of the principal. It may be necessary for the conduct of the ordinary business of a trading corporation and for the protection of those dealing with its officers, especially holders in due course of its negotiable paper, to raise such a presumption, and even to make it irrebuttable just as is done in the case of an ordinary trading partnership as to each of the members of the firm. But there is no more need of extending this principle to a nontrading corporation, or a fortiori to a charitable corporation, than to a nontrading partnership. And that a note executed by one part-

ner of a nontrading firm without the authority of his copartners is not binding on them, even in the hands of a holder in due course, has long been settled. See authorities collected in 1 Bates, Law of Partnership, §§ 343, 345: Parsons on Partnership (4th Ed.) § 85; 1 Daniel's Negotiable Instruments (5th Ed.) § 358a; 1 Randolph on Commercial Paper (2d Ed.) § 405; 1 Lindley on Partnership (2d Amer. Ed.) star page 130.

Moreover, in the absence of direct authority, it may fairly be assumed that this distinction based both on authority and reason will be accepted in Illinois, inasmuch as Illinois charitable corporations are exempted from the application of the principle of respondeat superior in suits for certain torts committed by their servants, not, as is held in some jurisdictions, because of the doctrine of assumed risk by the injured beneficiary of such a charity, but for the reasons stated in Parks v. Northwestern University, 218 Ill. 381, 75 N. E. 991, 2 L. R. A. (N. S.) 556, 4 Ann. Cas. 103, as follows:

"The reasons for exemption apply as well to private as to public charitable corporations. The appellee university is a private corporation, but is organized for purely charitable purposes. It declares no dividends and has no power to do so. It depends upon the income from its property and the endowments and gifts of benevolent persons for funds to carry out the sole object for which it was created—the dissemination of learning. All of its funds and property thus acquired are held in trust by it, to be applied in furtherance of the purpose of its organization and increasing its benefits to the public. The funds and property thus acquired are held in trust, and cannot be diverted to the purpose of paying damages for injuries caused by the negligent or wrongful acts of its servants and employés to persons who are enjoying the benefit of the charity. An institution of this character, doing charitable work of great benefit to the public without profit and depending upon gifts, donations, legacies, and bequests made by charitable persons for the successful accomplishment of its beneficial purposes, is not to be hampered in the acquisition of the property and funds from those wishing to contribute and assist in the charitable work, by any doubt that might arise in the minds of such intending donors as to whether the funds supplied by them will be applied to the purposes for which they intended to devote them, or diverted to the entirely different purpose of satisfying judgments recovered against the donee because of the negligent acts of those employed to carry the beneficent purpose into execution."

We are pressed with the contention that the doctrine, that a purchaser must at his peril ascertain whether or not the notes of a charitable corporation executed in its name by its president were issued pursuant to authority conferred upon him by the board of directors, is in conflict with the whole policy of the law of commercial paper; that "one of the constant endeavors to Legislatures and courts is to throw their protection around negotiable instruments and to aid and not impede their free transferability from hand to hand in the markets of the world, and with this end in view the law to-day is that even a thief who breaks in and steals from the maker's safe a properly executed note made payable to bearer can transfer and give title thereto, and that the bona fide purchaser of such a note can recover from the maker." The obvious answer to this is that no one can be obligated by a forgery or unauthorized use of his name, or, in the oft-quoted

201 F.—31

language of Justice Miller in The Floyd Acceptances, 7 Wall. 666, 19 L. Ed. 169:

"It is to be kept in mind that the protection which commercial usage throws around negotiable paper cannot be used to establish the authority by which it was originally issued."

[4] That no burden is placed on commerce by the rule which requires a purchaser even of commercial paper to ascertain whether its issuance was authorized by the managers of the corporation, the board of directors, is evident from the fact that such has long been the law in the state of New York and in most if not all other states. Practically, it will be found in the case of business corporations that some officers have been held out as having this authority, either by the express terms of the by-laws or resolutions or impliedly by the course of dealing. If, however, no such general agency has been created, if the acts are unauthorized, not ratified, and without benefit to the corporation, the loss should fall on the one dealing with the officer or on those claiming through or under him, rather than on the corporation, especially if it be a corporation not for pecuniary profit.

[5] There was no error in sustaining the demurrer to the fifth and sixth pleas, inasmuch as the defense of want of authority on the part of an officer of a corporation to execute notes in its name can be made under the verified plea of non est factum. Walsh v. Marvel, 130 Ill. App. 305; Ch. Elec. L. R. Co. v. Hutchinson, 25 Ill. App. 476.

The court erred, however, in excluding the evidence offered under this plea to rebut any presumption of authority. The judgment will therefore be reversed and the cause remanded, with direction to proceed further in accordance with this opinion.

HUMPHREY, District Judge (dissenting). The second, third, and fourth pleas averred failure of consideration and notice of that fact to plaintiff.

No proof was offered under the second or fourth pleas, and demurrer was sustained as to third plea, as to which ruling no error is relied on.

In this state of the record, the holders of the notes were bona fide holders, and, to make a defense against such holders, the law requires proof not only that there was no consideration, but also that the purchaser at the time of purchase had knowledge of such want of consideration. This is statutory in Illinois and is in accord with all the authorities. Hurd's Rev. Stat. 1909, c. 98, § 77; Mitchell v. Deeds, 49 Ill. 416, 95 Am. Dec. 621; National Bank of Am. v. Bank of Illinois, 164 Ill. 503, 45 N. E. 968.

Therefore the issues of want of consideration and bona fides are not in the case.

The controverted questions are: First, are the notes in question the legal obligations of St. Vincent College, raised by the first and seventh pleas; and, second, did the trial court err in sustaining demurrers to the fifth and sixth pleas?

Defendant in error contends, and plaintiff in error admits, that by

the terms of its charter the corporation, St. Vincent College, had inherent power to borrow money and execute notes; so that the single question remaining here is this: The notes having been issued by Byrne, the president of the college, in its corporate name and having passed by purchase for value and before maturity and without notice of any infirmity into the hands of bona fide innocent holders, did they become legal obligations against ·St. Vincent College in favor of such holders?

If we regard the question as one of general commercial law to be decided by rulings in state courts, then we should follow the Illinois rule because the Illinois court has decided the power given by the act under which these notes were made, and the courts of other states are hopelessly divided on the question. When we turn to the federal decisions, we find them in accord with the Illinois rule.

I think the decision of the United States Supreme Court in Louisville Ry. Co. v. Louisville Trust Co., 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081, is controlling here. In that case the defendant railway company was a corporation organized under the Indiana law. The Indiana statute contained the following provisions:

"The board of directors of any railway company organized under and pursuant to the laws of the state of Indiana, whose line of railway extends across the state in either direction, may, upon the petition of the holders of a majority of the stock of such railway company, direct the execution by such railway company of an endorsement guaranteeing the payment of the principal and interest of the bonds of any railway company organized under or pursuant to the laws of any adjoining state, the construction of whose line or lines of railway would be beneficial to the business or traffic of the railway so endorsing or guaranteeing such bonds."

Without the authority or assent of the majority of the stockholders a negotiable guaranty was executed under the seal of the corporation by order of the directors at their meeting on October 9, 1889, and was signed by the president and secretary of the corporation. The court said, on page 569 of 174 U. S., page 824 of 19 Sup. Ct. (43 L. Ed. 1081), with regard to the facts:

"No petition of a majority of the stockholders for the execution of the guaranty was ever presented, as required by the statute; there was no evidence that the stockholders ever authorized or ratified the contract or the guaranty; and, at the next annual meeting of the stockholders, in March, 1890, it was voted to reject and disapprove both the contract and the guaranty, as having been made without legal authority or the approval of the stockholders."

However, before the stockholders' meeting had been held, at which this action of disapproval took place, 125 of the bonds on which the guaranty was made had been negotiated and sold to bona fide purchasers. The court said, on pages 570 to 576 of 174 U. S., pages 824 and 825 of 19 Sup. Ct. (43 L. Ed. 1081):

"The controverted question is whether the bonds which the Louisville Trust Company and the Louisville Banking Company, respectively, purchased in good faith, and without notice of the want of the assent of the majority of the stockholders, are valid in the hands of these companies.

"The guaranty by the Louisville, New Albany & Chicago Railway Company of the bonds of the Beattyville Company was not ultra vires, in the sense of being outside the corporate powers of the former company; for the statute

of 1883 expressly authorized such a company to execute such a guaranty, and its board of directors to direct its execution by the company. The statute, indeed, made it a prerequisite, to the action of the board of directors, that it should be upon the petition of a majority of the stockholders; but this was only a regulation of the mode and the agencies by which the corporation should exercise the power granted to it.

"The distinction between the doing by a corporation of an act beyond the scope of the powers granted to it by law, on the one side, and an irregularity in the exercise of the granted powers, on the other, is well established, and has been constantly recognized by this court.

"One who takes from a railroad or business corporation, in good faith, and without actual notice of any inherent defect, a negotiable obligation issued by order of the board of directors, signed by the president and secretary in the name and under the seal of the corporation, and disclosing upon its face no want of authority, has the right to assume its validity, if the corporation could, by any action of its officers or stockholders, or of both, have authorized the execution and issue of the obligation.

"In Merchants' Bank v. State Bank, 10 Wall. 604, 19 L. Ed. 1008, this court stated, as an axiomatic principle in the law of corporations, this proposition: 'Where a party deals with a corporation in good faith—the transaction is not ultra vires—and he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists. If the contract can be valid under any circumstances, an innocent party in such a case has a right to presume their existence, and the corporation is estopped to deny them.'"

The decision is by a unanimous court, and the opinion is by Mr. Justice Gray. It decides, as I think, all the questions raised by the cases at bar. It discusses and settles the question that, where there is inherent power in a corporation to issue negotiable paper, irregularities in the manner of exercising its corporate powers will not defeat the paper in the hands of an innocent holder for value before maturity and without notice of the defect of power.

The opinion collects the English cases and those of our Supreme Court, and from a full analysis thereof arrives at the conclusion that, if the contract can be valid under any circumstances, an innocent party has the right to presume the existence of those circumstances, and the corporation is estopped to deny them.

The leading English case and one familiar to American courts is Bank v. Turquand, 6 El. & Bl. 327. This case has been adopted and followed by our Supreme Court.

The stockholders of the railroad company in the Louisville Case correspond to the trustees of the college in this case. In both cases there was inherent corporate power to do the thing that was done. In both cases the executive officer or officers acted without the statutory authority of the body creating such officer or officers. In this case, as in that, the requirement of initiatory action by the larger body was a regulation of the internal management of the corporation for the benefit and protection of its members, and when the act is on its face within the power of the corporation, as in the issue of the notes in question, and such notes pass into the hands of bona fide purchasers, without notice, the corporation cannot escape liability because of failure to comply with some regulation upon which the power of those acting for the corporation is made by the law to depend. See

opinion by Justice Brewer at circuit in Blair v. Railroad Co. (C. C.) 25 Fed. 684.

In Farmers' National Bank v. Sutton Mfg. Co., 52 Fed. at page 195, 3 C. C. A. at page 21, 17 L. R. A. 595, Judge Taft said:

"Every one dealing with a corporation is charged with notice of its corporate powers. If therefore a reference to the charter shows a seeming act of the corporation to be beyond its powers, it is void, and cannot be made the basis of any claim of liability against the corporation. But there are acts that may or may not be within the charter powers; their lawful character being dependent on the existence of a fact which cannot be known from the act itself. If the extrinsic fact upon which depends the lawful character of the act is one peculiarly within the knowledge of the general agent of the corporation by whom the act is done, the act itself is an implied representation that the necessary fact exists, the truth of which the corporation is estopped to deny against any person who in dealing with the corporation has parted with value on the faith of it. The principle has been frequently applied in cases of commercial paper issued in the name of the corporation by its officers having general authority to issue such paper."

Judge Taft's decision at circuit in the Louisville Case, 75 Fed. 433, 22 C. C. A. 378, is full of conclusive paragraphs.

"It is reasonable that the presumption of regularity should have more force in cases of instruments designed to pass from hand to hand as 'couriers without luggage' than in the case of nonnegotiable contracts. Webb v. Commissioners, L. R. 5 Q. B. 642. The doctrine of Bank v. Turquand is that the resolutions at meetings of stockholders are part of 'the indoor management' of the corporation, as Lord Hatherly calls it in Mahony v. Mining Co., L. R. 7 H. L. 869. 894 (see similar expressions by the same judge in Fountaine v. Railway Co., L. R. 5 Eq. 316, 322, and in Re Athenaeum Life Assur. Soc., 4 Kay & J. 549), and that the public cannot be expected to inform themselves of that of which the proper evidence is to be found only in the books and records of the company, to which they have no access," 75 Fed. page 464. 22 C. C. A. 410.

"Thus, it appears that where, by law, any fact in the internal management of the company is required to be recorded in a public office, the presumption of regularity does not apply, and as to it the outsider dealing with the company must advise himself." 75 Fed. page 465, 22 C. C. A. 411.

"In the case of private corporations, we do not understand that there is any necessity for recitals of due compliance on the face of their deeds, bonds, and notes. The fact of issue in proper form is an implied representation of the fulfillment of preliminary conditions. Lord Campbell referred to the issuance of the bond in the Turquand Case as a representation by the directors that the necessary meeting had been held. 5 El. & Bl. 248, 260." 75 Fed. page 467. 22 C. C. A. 412.

"In Miller v. Insurance Co., 92 Tenn. 167, 21 S. W. 39 [20 L. R. A. 765], a company was organized to insure against accidents in traveling. By a subsequent act, such companies were given authority, if the amendment was accepted by a vote of the stockholders, to issue policies of insurance against accidents from any cause or from death by disease. Without action by the stockholders, policies were issued by the directors covering the additional risks. It was held by the Supreme Court of Tennessee, Chief Justice Lurton delivering the opinion, that, on the authority of Bank v. Turquand, the policy holder had the right to presume, from the act of the directors, that the new amendment had been accepted by the stockholders." 75 Fed. page 467, 22 C. C. A. 413.

What diligence is required by the law of one about to purchase the commercial paper of a corporation? Clearly it is that such proposed purchaser shall compare the written evidence of the act of the corporation—the paper as it appears on its face—with the publicly

recorded evidence of the powers of the corporation and the manner of exercise of such powers; and if the comparison shows nothing inconsistent the purchaser is not required to look farther. Louisville Trust Co. v. Louisville Railroad Co., 75 Fed. 456, 22 C. C. A. 378.

But it is contended that such prospective purchaser must go further; that, as he is informed by the terms of the statute that the corporation could borrow money only when the proper officer was authorized to do so by the vote of the majority of the members, it became his duty to inquire whether this had been done—to search the records of the corporation for this purpose. I cannot agree with this view. Corporation records are private—even quasi public records, as those of a railroad company, have been so held.

In Blair v. Railroad Co., supra, 25 Fed. at page 686, Judge Brewer said:

"Now I do not understand that a man, dealing with a private corporation, or even a quasi public corporation, like a railroad, is bound to take notice of what the records of that corporation show, for, if it be so, no man can deal with a corporation in safety without first having access to and an examination of its books; and the converse of that would be true, that such a corporation is bound to show its records to whomsoever has dealings with it. In a certain sense, the books of a corporation, so far as persons dealing with it are concerned, are their own private records, and are not open to the inspection or knowledge of strangers, and persons are at liberty to deal with a corporation freely without danger of running against equities or claims unless they are disclosed by the public records, just the same as in dealing with an individual."

In the application of this doctrine there is no distinction between a business corporation and a charitable corporation when the latter engages in an act of business.

In Illinois Conference v. Plagge, 177 Ill. 431, 53 N. E. 76, 69 Am. St. Rep. 252, the suit was on a note given by a religious body organized under the same Illinois statute as St. Vincent College, and the court in answering the same defense here set up said:

"We do not construe the provisions of the statute hereinbefore set out to make it indispensable it should expressly appear from the record of the proceedings of the conference a majority of the members voted to authorize money to be borrowed or for measures or proceedings having the effect to ratify the act of the board of trustees in borrowing the money."

To the same effect is National Home Building Association v. Bank, 181 Ill. 35, 54 N. E. 619, 64 L. R. A. 399, 72 Am. St. Rep. 245.

It is urged by plaintiff in error that there is such distinction, and that the Supreme Court so recognized it because in the Louisville Trust Company Case in the first line of the last paragraph but one on page 573 of 174 U. S., page 825 of 19 Sup. Ct. (43 L. Ed. 1081), the court used the words "a railroad or business corporation." I think from the language of the entire opinion that the court intended no such distinction. Educational corporations must and do perform many acts of business, and some of these transactions run into large sums of money. To make the distinction urged would be to destroy the negotiability of such commercial paper and say that the law merchant does not apply to negotiable instruments issued by educational institutions. There is no law declaring such immunity nor creating

such exemption. In support of the rule contended for, many state cases are cited by plaintiff in error, and one federal decision. The latter is Palmer v. Wardens and Vestrymen of St. Stephen's Church (C. C.) 16 Fed. 742, decided by Judge Blodgett in 1883, six years prior to the Louisville decision. I have carefully considered that case. Judge Blodgett found that the admission of the officers who signed the note in that case was the only evidence in the record that they were the duly appointed officers to execute commercial paper on behalf of the church, and he held that the liability of the church could not be established in that way. In other words, he held that the note in question was not the obligation of St. Stephen's church.

Another case relied upon as showing the distinction between the powers of religious corporations and those created for business purposes is People's Bank v. St. Anthony's Roman Catholic Church, 109 N. Y. 512, 17 N. E. 408. I do not think this case supports the contention of plaintiff in error. The corporation was organized under an act of New York for the special benefit of the Catholic Church, and in the case cited the court held that the members of the board of trustees, having acted separately and not jointly as a body, had failed to bring the corporation within the terms of the act so as to make the note sued on the obligation of the church.

Many of the state cases cited by plaintiff in error were actions on the case, and the charitable institutions which had been made defendants on account of injuries suffered through negligence of their employés under the doctrine of respondeat superior were held not liable. In nearly every instance the plaintiff had applied voluntarily for the benefits of the institution, and the negligent employés were in the performance of its charitable functions, and the courts held that the doctrine of assumed risk would apply. The rule is wholly different in cases ex contractu, for in such cases, if there be no distinction between a business and a charitable corporation when the latter is performing a business act, then clearly the rule is that when a corporation, business or charitable, by authority of law, and, as in this case, by its by-laws, holds out an officer as the proper person to execute notes in its name, the corporation cannot deny such paper in the hands of an innocent holder for value before maturity and without notice. Cromwell v. County of Sac, 96 U. S. 51, 24 L. Ed. 681; Credit Co. v. Howe Machine Co., 54 Conn. 387, 8 Atl. 472, 1 Am. St. Rep. 123; Matson v. Alley, 141 Ill. 284, 31 N. E. 419; Farmers' Natl. Bank v. Sutton Mfg. Co., 52 Fed. 191, 3 C. C. A. 1, 17 L. R. A. 595; Murphy v. Arkansas (C. C.) 97 Fed. 723; Ex parte Estabrook, 2 Low. 547, Fed. Cas. No. 4,534; Tod v. Kentucky Union Land Co. (C. C.) 57 Fed. 47.

It is argued on behalf of plaintiff in error that these notes cannot be held to be the obligations of the corporation unless the law makes it an irrebuttable presumption that the president of an Illinois corporation, simply by virtue of his office, has power to bind the corporation by a note. That this is the law in Illinois there seems to be no doubt. Insurance Co. v. White, 106 Ill. 75; McDonald v. Chisholm, 131 Ill. 273, 23 N. E. 596; Atwater v. Bank, 152 Ill. 620, 38

N. E. 1017; Durkee v. People, 155 Ill. 363, 40 N. E. 626, 46 Am. St. Rep. 340; Lloyd & Co. v. Matthews, 223 Ill. 481, 79 N. E. 172, 7 L. R. A. (N. S.) 376, 114 Am. St. Rep. 346. To the same effect is Bank v. Pottery Co. (C. C.) 55 Fed. 265.

The case of Bank v. Atkinson (C. C.) in 55 Fed. 465, which it is claimed reverses this rule, is not in point because in the latter case Woods, the president of the plaintiff bank, had knowledge of the irregularity when the note was made. In most of the states the rule is different, as shown by the text-book writers: 3 Cook, Corporations (6th Ed.) § 716; 2 Thompson, Corporations (2d Ed.) § 1452.

However, I do not think the case turns upon this single question. In the case at bar Byrne, the president, was designated as the person to sign notes for the corporation. This power was given to no other officer and it was given to him as one of his duties.

It is altogether aside to say that he could only sign after certain preliminary action by the trustees. The corporation, having inherent power to make notes and having designated its president as the person having power to sign them in its name, must become obedient to the rule so carefully expounded by the courts that the bona fide holder has a right to presume that all necessary preliminary steps have been taken and the corporation cannot escape the obligation.

Why should the rule of liability be modified in the case of a charitable or educational corporation where it engages in a business act? It is said in argument that it should have immunity because its officers are dealing with trust funds. The officers of all corporations handle trust funds. To give the immunity contended for would invite every variety of fraud and deception. The commercial world would distrust such institution because it would be practically impossible for the lender to know when the inquiry as to legal compliance had been pursued far enough. Charitable institutions officered by honest men would be embarrassed in carrying out their corporate functions and to such the rule would work an actual hardship. Such corporations have it in their power to select, as their managing officers, persons who are neither weak nor dishonest. The commercial world has no voice in this selection, and it is not only legal but equitable that the same rule should apply to both business and charitable corporations.

The Supreme Court of Illinois well expressed this idea in Y. M. C. A. v. Bank, 179 Ill. 599, 54 N. E. 297, 46 L. R. A. 753, 70 Am. St. Rep. 135, where it said:

"If a loss occurs wherein one of two innocent persons must suffer, that one should sustain the loss who has most trusted the party through whom the loss came."